**FOREMOST DAIRIES, et al v. MILK COMMISSION.**

**No. 8887.**

Circuit Court, Leon County.

July 9, 1958.

Mabry, Reaves, Carlton, Fields & Ward, Tampa and Loftin & Wahl and Harold Colee, Jr., all of Jacksonville for petitioners.

Clayton, Arnow, Duncan & Johnston, Gainesville, for respondents.

BEN C. WILLIS, Circuit Judge.

This cause came on for hearing on the petitioner's petition for a writ of certiorari to review official order no. 20-11 of respondent Florida Milk Commission titled "In the Matter of a Base Fixing Plan For All Milk Marketing Areas Except the Pensacola Milk Marketing Area," dated January 16, 1958, filed with the Secretary of State and posted in the office of the Milk Commission on January 30, 1958. To this petition the respondents have filed their motion to deny and dismiss the petition. Briefs of the parties have been filed and studied and oral argument by counsel for the parties heard, and the court is advised of its opinion in the premises.

The petitioners are each a licensed milk distributor as defined in chapter 501, Florida Statutes, and each is subject to and will be directly affected by said order.

The petitioners assert that said order is void on its face and in substance contend that—

No statutory power exists in the commission to fix "bases" of milk production and to impose contractual or other obligations upon producers and distributors with respect to the amount of milk the distributors must accept and pay for during any period of time at prices fixed by the commission.

The order provides unlawful restrictions upon termination of contractual relations between producer and distributor by embodying the provisions of official order 20-7, which requires

a showing of "just cause" for termination of a previously established relationship between producer and distributor.

The order, by creating certain contractual relationships between producer and distributor, denies liberty of contract and constitutes a taking of private property without due process of law in violation of section 1, 14th amendment, U. S. constitution, and section 12, declaration of rights, Florida constitution.

That if there is statutory power to fix bases imposing contractual obligations, such attempt to grant such power constitutes an unlawful delegation of power, for no standard for fixing bases is provided by the legislative act.

That the order had insufficient legal predicates because of no proper hearing or record to support the order; no proper findings of fact; and other procedural deficiencies.

That the order is arbitrary, unreasonable, capricious, and discriminatory, primarily because of producing monopolistic privileges and preferences to present producers and discriminates against out-of-state producers.

That it violates the Commerce Clause of the U. S. constitution (art. 1, sec. 8, clause 3 and sec. 10, clause 2) because it will affect milk produced out-of-state handled by a distributor by bringing into effect F. S. 501.13 (8) relating to prices to be paid for out-of-state milk and that said statute itself is unconstitutional as violative of the Commerce Clause.

The respondents, in resisting the petition, contend, inter alia, that certiorari does not lie to review this order because the order is quasi-legislative and not quasi-judicial. They also contend that the petitioners are not entitled to a hearing in this court on the issues raised by them because of failure to raise their objections at the administrative hearing and failure to show any legal or substantial interest in the order. Most of these points have been fully discussed in the order this day entered by this court in National Dairy Products Corp. v. Milk Commission, 13 Fla. Supp. 1. Reference is made to that order and the discussion there set forth will not be repeated here. It is sufficient to observe that this court is of the view that the petitioners are or may be aggrieved parties because of the order of the commission, that the order promulgated by the commission has judicial attributes in its predicates, that certiorari is the available method of review of the order and the petition is properly presented by the petitioners.

Moving then, to the merits of the case, it first becomes necessary to construe the challenged order in the aspects it affects the petitioners, who are licensed milk distributors. It is elementary that a court will construe an administrative order so as to find same to be valid, if such a construction is available.

Preliminary fact finding set forth in the opening paragraph of the order states that the commission has determined that "the following base fixing plan will establish proper relationship of producers with distributors" and "will establish for distributors . . . proper relationships with their producers, so that fair and uniform methods of relationship may exist at all times to maintain an orderly production of milk and an orderly distribution of milk and milk products in all of the milk marketing areas . . . except the Pensacola . . . area."

Section 1 of the order contains definitions of "producer" and "distributor." A "producer" is any legal entity producing milk within the state of Florida, including cooperatives under chapter 618, Florida Statutes. This term must also be construed according to the definition of "producer" in F. S. 501.02, which says that "producer" and "dairy farmer" are one and the same and both are a person (natural or artificial) producing milk within the state. At this point, a pause is made to observe that the "producing" of milk by a "producer" is limited to the taking of milk from dairy animals *in the state of Florida* by the dairy farmer who operates his dairy farm *in the state of Florida* and the delivery of such milk by such farmer to a milk dealer in this state. Included are also the cooperatives under chapter 618, but only in the sense that the cooperative represents collectively its member Florida dairy farmers and is doing for them collectively what they individually might do. Also, milk "produced", within the meaning of this order, is only that which the dairy farmer takes from the animals on his farm and in the course of his ordinary dairy farming. This point is made here to foreclose any interpretation of the order of the commission on this court's order entered herein as embracing any transaction of a dairy farmer or anyone else whereby milk is purchased or otherwise procured from another dairy farmer or producer and the milk so acquired delivered to a milk dealer. The order under review is and can only be construed to reach and regulate milk produced from animals on the farm of the "producer" in this state. No protection is intended to be provided in order no. 20-11 for a milk broker, or one who acquires the milk he delivers to the dealer in any manner other than his own dairy operations. Of course, this does not strictly apply to the milk cooperatives, but in this regard, the milk cooperatives are only acting collectively for their member farmers. The cooperatives may not claim any rights for any milk not acquired by them from the production on the farms of their members.

A "distributor" is defined in the order and the statute as a milk dealer who operates a milk gathering station or processing plant where milk is collected and bottled or otherwise processed and pre-

pared for sale. It is limited in order no. 20-11 to only those distributors within the marketing areas affected by the order.

Section 2 of the order prescribes the first "base fixing period" for each of the marketing areas. In the Tampa area it is from November 1, 1958 to January 31, 1959; in the Central Florida area it is from September 1, 1958 to December 31, 1958; and in the Northeast and the Tallahassee areas it is from September 1, 1958 to November 30, 1958. It is also provided that subsequent price fixing periods shall be the corresponding dates of succeeding years, with the exception that in the Central Florida area the periods subsequent to the first shall be from September 1 to November 30 instead of September 1 to December 31.

No challenge is made to these periods so prescribed with regard to their reasonableness or soundness. The challenges are made to the ultimate effect of the entire order in requiring the taking of milk and paying fixed prices for same.

Section 3 of the order requires that during the base fixing period each producer shall establish a base with *his* distributor and each distributor shall establish a base with each of *its* producers.

It appears that during the base setting period the distributor accepts from the producers establishing a base with it the milk which such producers deliver. At the end of the period, a computation is made of the total quantity delivered by all producers to the distributor and the quantity delivered by each producer. Section 6 of the order requires that a "base percentage" shall be determined for each producer "by calculating the ratio of the milk delivered [by such producer] to the total milk delivered by all producers for the entire base fixing period, which percentage is referred to herein as 'earned base.' "

Section 7 (a) of the order provides that the base percentage earned by each producer "shall be applied to the total number of gallons of milk utilized in class I channels" by the producer's distributor "to determine the number of gallons of milk for which the producer must be paid at the class I price fixed by the commission."

Milk "utilized in class I channels" is that which the distributor markets as fluid milk in the form received by the ultimate consumer. Milk so used commands the highest price fixed by the commission. Under existing orders, the price for class I milk to be paid to the producer by the distributor is 61¢ per gallon, adjusted for butterfat content above or below 4%.

Section 7 (a) provides also that "in case a producer fails to produce the amount of milk his 'earned base' entitles him to, in class I channels, such deficit must be reallocated to the other 'earned

base' producers in proportion to their 'earned bases,' and the class I price paid for the milk so reallocated."

Section 7 (b) requires that the same method be applied for computing allocations for all other classes.

The other classes of milk are class II and class III. Class II milk is that which the distributor does not use in class I channels, but from which the cream is separated and the cream and skimmed milk are used in other milk products. Class III, also called "distress milk," is milk from which the cream is separated and used but the skimmed milk is dumped because there is no ready use for same. Classes II and III are also referred to as "surplus milk", as same is surplus to the distributor's needs to supply its market for fluid whole milk it distributes for consumption as whole milk.

Section 7 (c) requires that first allocation of a producer's deliveries shall be to class I utilization "with allocation continued thereafter in descending order of price through class III classification." It also provides that "The balance of any producer's production after the above allocations may then be placed in the lowest price classification."

Section 7 (d) requires that in computing class I sales to be allocated to producers "no adjustment shall be made for milk received . . . from sources other than 'earned base' producers," and section 7 (e) provides that in computing milk utilization to be allocated to producers "milk transferred or diverted shall be classified and allocated according to its final utilization."

At this point it is pertinent to observe that the method of dealings between producers and distributors which have heretofore been generally followed in this state have been substantially that which this order prescribes. Base periods have been used and "earned bases" established during those periods have been applied in computing the prices paid to producers. Class I prices, established by the commission, have been paid to the "earned percentage" of the producer's milk delivered. For the remainder the distributor has paid "surplus milk" prices, which are prices the distributor deems to be equivalent to the market price of the cream and serum solids extracted from the milk and put to use by the distributor. Until the issuing of the price fixing orders, which are dealt with and upheld in National Dairy Products Corp. v. Milk Commission, supra, there were no commission fixed prices for classes II and III milk. Now there are fixed prices for these classes, as well as for class I. In fact, these price fixing orders and order no. 20-11 (under attack in this case) were issued following hearings at which both of these matters were considered. Order no. 20-11 and the price

fixing orders are closely related and no. 20-11 must be considered with the price fixing orders.

Against this background, it must be noted that generally producers and distributors have had a previous course of dealing of establishing bases and paying for milk delivered proportionately according to the uses the distributor makes of milk received.

The order under review provides, in its section 4, that the base established "shall be construed as a binding contract between producers and their distributors . . . and said base or contract shall remain in full force and effect from the first day of the second month following the end of the base fixing period until the first day of the second month following the end of the next ensuing base fixing period, unless terminated in accordance with provisions of official order no. 20-7."

Also in section 8 it is provided—"unless terminated in accordance with the provisions of official order no. 20-7, all existing bases and relationships between producers and distributors . . . shall remain in full force and effect until the first day of the second month following the end of the first base fixing period provided in paragraph [section] two hereof."

The last mentioned provision has the purpose and effect of rendering existing bases and relationships, theretofore entered into between producers and distributors, in the nature of a continuing contract to be performed until the first day of the second month following the end of the first base fixing period provided in the order, unless such relationship be terminated consistent with order no. 20-7.

Order 20-7, effective July 1, 1957, promulgated June 11, 1957, must be examined. It says, in a preamble "Whereas" clause, that it has come to the attention of the commission that distributors may have such control over their producers as a result of their power to terminate their relationships with their producers without cause so as to place the producer in the position of being unwilling to avail himself of the remedies of chapter 501, F. S., and such power in the distributor may tend to interfere with the enforcement of this chapter and with the orderly marketing of milk. In brief, there is a finding that there is a greatly disproportionate bargaining power as between these two segments of the milk industry to the disadvantage of the producer and that such tends to enable the distributor to summarily discontinue previous relationships with impunity and for no good reason. Further, it is a finding that such an advantage may tend to interfere with enforcement of the Milk Act (chapter 501) and interfere with "the orderly marketing of milk."

The body of this order then prohibits the termination "without just cause" of "a previously established relationship" between producer and distributor, "as evidenced by the producer having established a base with the distributor." It is required that such termination, to be effective, must have the approval of the commission.

The order further defines "just cause", to be considered as such by the commission, as "any cause deemed 'just' by a prudent and reasonable man." It also says that "arbitrary, capricious, or vindictive reasons are not 'just' reasons." Also, it authorizes termination at any time by mutual consent. Further provision is made that "not less than 90 days notice . . . will continue to be given by either party before the new base fixing period, stating the reason for the termination and a certified copy [of the notice] filed with the commission." It then provides that "the aggrieved party" must file "any appeals" with the commission within 15 days after such notification.

This specific order (no. 20-7) is not directly attacked in this suit, as indeed it could not be, but as its terms are, by reference, included within the order under timely challenge in this suit, it will be examined and construed. This order is obviously an effort to implement portions of F. S. 501.05 and of F. S. 501.09 (3) (a). F. S. 501.05, in part, authorizes the commission to "set a standard date as the date from which not less than 90 days notice in writing must be given by the dairy farmer or distributor before the theretofore established relationship between the dairy farmer and distributor may be terminated."

F. S. 501.09 (3) (a), read with other parts of F. S. 501.09 (3) authorizes the commission to decline to grant a license or permit or to suspend or revoke a license or permit of a milk dealer who "has rejected, without reasonable cause or reasonable advance notice, milk delivered by or on behalf of a producer in ordinary continuance of *a previous course* of *dealing* except where *contract* has been lawfully terminated." (Emphasis supplied.)

Order no. 20-7 specifically sets the "standard date" mentioned in F. S. 501.05 as being 90 days prior to the beginning of a new base fixing period. It further has spelled out to some extent what "reasonable cause" is, as a valid basis for termination of a "continuance of a previous course of dealing" with reference to rejecting milk delivered to a distributor by a producer. The definition of reasonable cause as "just cause" or what would be deemed "just" by a prudent and reasonable man is in complete harmony with what courts have consistently regarded as the test of a "reasonable cause". No citation of authority need be given in support of this.

Also arbitrary, capricious and vindictive reasons can never be viewed as valid if there must be a reasonable cause for terminating a relationship. The order specifically recognizes the right of termination of the relationship at any time by mutual consent of the parties.

To require that written notice of termination and the reasons therefor be made a matter of record with the commission is but a method of policing to enable the agency to properly enforce the law. A short appeal period by an aggrieved party is a permissible administrative aid to settling any potential dispute between the parties and to quickly approve or disapprove the termination sought.

Therefore, it appears that order no. 20-7 is a regulation of the commission wholly consistent with statutory provisions and deals with matters "reasonably incidental" to powers recited in the Act. See F. S. 501.04 (9). The terms "theretofore established relationship," used in F. S. 501.05, and "previous course of dealing" and "contract", used in F. S. 501.09 (3), appear to clearly contemplate the existence of a contractual status between the producer and distributor. For the commission to regard the participation by a producer and a distributor in the establishing of an earned base during a base fixing period followed by a method of payment for milk delivered based upon the earned base as creating a contractual status between these parties is well founded in the statutory provisions. Also, to specify the rules for terminating such contractual status is within the commission's power and the rules so specified are clearly harmonious with statutory provisions.

Therefore, the provisions of section 8 of the order under attack, relating to termination of existing bases and relationships between producers and distributors, have firm statutory sanction.

It is now necessary to construe the order in its parts which require producers and distributors to participate in base fixing procedures, establish earned bases, and create contractual relationships between these parties to be maintained in the future.

Section 3 imposes an obligation on a producer to find, if he can, a distributor with whom he may establish a base during the prescribed base fixing period. Having found one willing for him to participate, the producer then proceeds to establish his base by delivering milk to his distributor. Having fixed his base during the designated period, he becomes obligated to deal exclusively with his distributor in the delivery of milk produced by him during the year commencing on the first day of the second month following the end of the base fixing period. See section 4 of the order. He is not committed to deliver any minimum quantity of milk, but he cannot

deliver his milk to any other licensed dealer without the consent of the commission and the dealer with whom he has established his base. Likewise, the distributor, under section 4, is contractually obligated to each of the producers who have established a base with it to receive the milk delivered and to pay proportionately the appropriate class fixed price for the milk according to the uses the distributor makes of milk it markets or uses during the periods of delivery by the producers. The distributor is obligated to pay the prices for the highest class of its own utilization regardless of whether the milk so used came from his base earned producers or other sources. The distributor is not prohibited from buying milk from others, out-of-state or elsewhere, and paying to such others any price it and the seller can agree upon. However, if it does this and uses the milk so bought in class I channels, it cannot make an adjustment in the classes in computing the prices to be paid "earned base" producers.

For example: Earned base producers A, B, C and D each deliver to their distributor X, 25,000 gallons of 4% butterfat milk. Each has a 25% earned base percentage. During the same period distributor X purchases 50,000 gallons of 4% butterfat milk from other sources. During this period, distributor X distributes in class I channels 125,000 gallons. He must pay class I prices to A, B, C and D for all of the milk they have delivered. However, if distributor X had distributed 60,000 gallons in class I channels, 60,000 gallons in class II, and 30,000 gallons in class III, there is a different story. A, B, C and D would each be paid class I prices for 15,000 gallons (25% of 60,000) and class II prices for their remaining 10,000 gallons. Carrying the example a step further, if distributor X puts only 30,000 gallons in class I uses and 30,000 gallons in class II channels, then A, B, C and D would each be entitled to payment for 7,500 gallons at class I prices, 7,500 gallons at class II prices, and for the remaining 10,000 gallons, class III prices. The distributor cannot, by acquiring milk from other sources than its earned base producers and putting such milk to class I uses, affect the classification of his earned base producers. In effect, it is deemed that it is their milk which moves in the highest classification used by the distributor during the period.

There is nothing in this order to prevent the distributor from entering into any contractual relationship it desires with other suppliers of milk. It can voluntarily agree with such suppliers for an "earned base" and method of payment by classes of use or any other arrangement. However, such agreements with other suppliers cannot be considered in computing the payments to be made to "earned base" producers.

The petitioners urge that the commission has no statutory power to enter an order commanding the fixing of bases, imposing requirements for termination of relationships between producers and distributors beyond a simple notice requirement set forth in F. S. 501.05, or to impose contracts on distributors to accept and pay for milk tendered by producers. They point out that chapter 501, Florida Statutes, nowhere specifically confers these powers, and that for them to be necessarily inferred from specifically granted powers any doubt of such inference must be resolved against the existence of such powers.

It is well settled that administrative agencies, created by statute, have no powers that the statute does not confer and any reasonable doubt as to the lawful existences of a particular power must result in the arresting of the attempted exercise of such power. 42 Am. Jur., Public Administrative Law, sec. 68; Edgerton v. International Company, Inc., 89 So. 2d 488. The judicial determination of whether or not a challenged power exists is to be found not so much by applying principles of strict or liberal construction, but rather by ascertaining whether the statute shows a clear legislative intent to confer such a power. The more unusual or drastic the power, the greater must be the clarity of its existence, for it must be presumed the legislators did not intend to interfere with private relationships more than they have lucidly pronounced. On the other hand, failure to set forth specifically in so many words a particular power does not compel a negative finding. If, from the whole context of the Act as against the background of the subject matter dealt with and the problems sought to be resolved, there is a clear purpose to clothe the agency with a particular power, though not expressly stated, the exercise of that power will not be met with judicial interference.

Base fixing and contractual relationships between producers and distributors arising therefrom with regard to milk to be accepted and paid for, is not expressly mentioned in the statute creating this commission and prescribing the scope of its operations. If power to promulgate order no. 20-11 exists, it must be found to be necessarily implied from other powers expressly granted.

Chapter 501, Florida Statutes, contains the following provisions deemed by the court to be pertinent—

501.01. *Legislative finding; statement of policy.*— * * * It is declared . . . that unhealthful, unfair, unjust, destructive, demoralizing and uneconomic trade practices have grown up and been carried on in the production, sale and distribution of milk, cream and milk products in this state which impair dairy industry in this state . . .; * * * and the production . . . distribution and sale of milk, cream and milk products to be a paramount industry upon which the prosperity of the state . . . depends. In order to correct abuses arising from the destructive and

unfair manipulation of prices which are found to spring from a selfish disregard of the public interest in the manner of carrying on the dairy industry, which is an organized industry, it is found necessary to resort to the legislative remedy of *regulating* prices to save both producers and consumers from such manipulation of prices in the industry; * * *. (Emphasis supplied.)

501.04. *Powers of Milk Commission*—The milk commission is declared to be an instrumentality of the state for the purpose of attaining the ends recited in the legislative findings and may:

(1) Supervise and regulate the entire milk industry of the state, including the production . . . distribution, delivery and sale of milk, cream and milk products, in any market established by the commission in the state; * * *

(2) Investigate all matters pertaining to the production . . . distribution and sale of milk in the state. * * *

(9) Make, adopt and enforce all rules, regulations and orders necessary to carry out the purposes of this chapter; * * * The commission, after public hearing and investigation, may fix the prices to be paid producers by distributors . . . may establish rules and regulations for fair competition . . .; *and may regulate all matters reasonably incidental to the general or specific* powers herein recited; * * *

(11) The operation and effect of any provision of this chapter conferring a general power upon the commission shall not be impaired or qualified by the granting to the commission by this chapter of a specific power or powers.

501.05. *Rules and orders of milk commission.*—The commission shall adopt and enforce all rules and orders necessary to carry out the provisions of this chapter . . .; * * * and shall set a standard date as the date from which not less than ninety days notice in writing must be given by the dairy farmer or distributor before the theretofore established relationship between the dairy farmer and distributor may be terminated. It shall be the duty of . . . all licensees to cooperate with the commission in carrying out the provisions of this section. * * *

501.09. *Issuance, revocation, etc., of licenses to milk dealers.*— * * *

(3) The commission may decline to grant any license or permit required hereby or may suspend or revoke a license or permit already granted upon due notice and opportunity of hearing to applicant, licensee or permittee, when satisfied of the existence of any of the following:

(a) That a milk dealer . . . has rejected without reasonable cause or reasonable advance notice, milk delivered by or on behalf of a producer in ordinary continuance of a previous course of dealing except where contract has been lawfully terminated. * * *

(e) Where the milk dealer has continued in a course of dealing of such a nature as to satisfy the commission of his inability or unwillingness properly to conduct the business of receiving or selling milk.

In addition to the foregoing provisions, F. S. 501.13 grants the commission detailed price fixing powers, including prices to be paid producers by milk dealers and authorizes classification, for price fixing purposes, by forms, classes, grades *or uses.*

The above provisions reveal clearly that the legislature was seeking to correct bad trade practices which prevailed in the production, sale and distribution of milk which impaired the dairy industry, which is a paramount industry upon which the state's prosperity depends. A purpose of chapter 501 is to correct abuses arising from unfair manipulation of prices, and this was sought to be met by regulating prices to save producers and consumers from the evils of such price manipulation. The milk commission was thus created for the purpose of attaining the ends recited in the legislative findings and is given the power and duty to supervise and regulate the entire milk industry including the production, distribution and sale of milk. It was empowered to fix prices to be paid producers according to uses of the milk, to establish rules and regulations for fair competition, and to regulate all matters reasonably incidental to general or specific powers granted. The discretion granted was broad, but was circumscribed to the extent of touching matters which were reasonably incidental to the objects sought to be obtained.

The power to *fix* prices is merely one specific means within the broader power of *regulating* prices to prevent unfair or demoralizing manipulation of prices which the legislature recognized as impairing a paramount industry. To stabilize and harmonize the various segments of this industry, their relations with each other are obviously matters to be reckoned with. To fix prices to be paid by one segment to another would be unavailing if the objective of suppressing harmful manipulation of prices could be evaded or frustrated. Furthermore, this is an industry composed of separate and to a large degree independent segments, but which are interrelated so that a healthy and productive overall industry requires cooperation and a blending of their respective interests. To achieve this cooperation, the commission would necessarily have the power to prescribe what such cooperation must be and to take necessary measures to assure compliance. This power, of course, must be reasonably exercised, not be discriminatory or confiscatory and directly pertinent to a lawful object.

By this order, the commission has set forth in clear manner just how the producers and distributors shall deal with each other and what their respective rights and obligations are. It has used basically the same procedures which the industry developed itself but

with greater definiteness and with safeguards to prevent sudden, arbitrary, capricious or vindictive breaking down of the relationships. It has specified that such relationships shall have the same legal effect as a contract between the parties, but authorizes such "contract" to be terminated by much the same means of terminating a voluntary contract. In fact, it provides perhaps greater opportunities to terminate than would be true of voluntary contracts, for it may be brought to an end for any cause deemed "just" by a reasonable and prudent man. It cannot be assumed that the commission would refuse to approve a termination when such refusal would impose an unfair or unusual hardship on a distributor or a producer.

It is accordingly held that there is necessarily inferred power conferred upon the commission to enter the order here under review. The petitioners' contentions that the language in F. S. 501.05 necessarily compels that all relationships between producer and distributor must be voluntary do not appear to coincide with other portions of the Act giving extensive powers of supervising and regulating the milk industry. To follow their reasoning, the commission, in this phase, may counsel, urge and seek to persuade but may not order. It is clear that the commission may order what is reasonably incidental to prevention of disrupting and demoralizing price manipulation and unfair trade practices.

Furthermore, I cannot conclude that this inferred power is void as an unlawful delegation because of absence of rules or standards to guide the commission. The Act contains many guides in fixing prices, classifying milk and standards to be observed in such fixing of prices.

The discretion conferred on the commission is not unbridled but must be reasonably incidental to the objects sought to be achieved by the legislation. These are not so vague as to render the inferred power void.

The petitioners have cited and discussed a number of cases from other jurisdictions in which base fixing orders have been judicially condemned. The respondents have cited cases to the contrary. These cases have been examined and are not deemed to be controlling of the issues here. The order here, when construed with its limitations as well as its breadth, is clothed with legislative sanction.

I also do not find that the order transgresses constitutional bounds. An industry affected with a public interest may be reasonably regulated and it is beyond question in this state that the milk industry is so classified. Such regulation may restrain

to some extent the liberty of contract or require the assuming of contractual relationships so long as it is reasonably related to the lawful objects of the regulation. No showing is made here that the petitioners are being required to do more than pay prices and maintain relationships with their producers to yield to the latter a reasonable return for their milk operations. No showing is made that there is discrimination in the obligations imposed on both segments. I find no deprivation of property without due process of law.

Petitioners contend that this order creates monopolistic privileges on present producers to the injury of petitioners and new producers. I find nothing in the order to prohibit the distributor from taking on any producer, old or new, it wishes to and to grant such producer an earned base during the price fixing period. Both new and old producers would earn bases and be paid accordingly. I do not see how this hurts the distributor as he pays on the basis of use it puts to its milk. Whether it is a new or old producer whom it pays would make no difference to the distributor.

Another assault made on the order is that it obstructs interstate commerce and discriminates against interstate commerce. This seems to be bottomed upon the view that the distributors are not free to purchase out-of-state milk because if they do they will have to pay the same prices for it as for Florida milk pursuant to F. S. 501.13 (8). It is contended that F. S. 501.13 (8) is unconstitutional and there is cited Baldwin v. Seelig, Inc., 294 U. S. 571, 55 S. Ct. 497, in which a similar provision in the New York law was invalidated. As it is unnecessary to pass on the validity of this portion of the statute, this will not be considered. There is nothing in the order which seeks to invoke or apply F. S. 501.13 (8) nor is there implicit any purpose to enforce it. So far as this order is concerned, the petitioners may buy any milk they wish out of state, pay whatever prices they choose to pay, and do with it what they will. What they cannot do is put this milk ahead of their earned base producers in higher classifications of use in computing what they pay their producers. They can pay the out-of-state producers as high a price as they wish or as low as they can get it for.

If there be any discrimination, and I do not hold that there is, it is solely against out-of-state producers whose rights are not involved in this case.

Petitioners have raised other questions challenging the order as being based upon an insufficient hearing and record, improper lumping together of marketing areas, absence of rules of practice and insufficient findings of fact. These points have been extensively discussed in an order by this court, National Dairy Prod-

ucts Corp. v. Milk Commission, 13 Fla. Supp. 1. Suffice it to say I do not find these points well taken in this case, but do find that the order is based on adequate procedural predicates and was reached in compliance with the essential requirements of law.

In conclusion, I do not find that the order is arbitrary, unreasonable or capricious, but that it has a sound basis and is reasonably geared to the accomplishment of lawful objectives, and to meeting some of the problems F. S. chapter 501 was enacted to reach.

The petition for a writ of certiorari is therefore denied.