# NATIONAL DAIRY PRODUCTS CORP. v. MILK COMMISSION.

## No. 8891.

### Circuit Court, Leon County.

### July 9, 1958.

Loftin & Wahl and Bedell & Bedell, all of Jacksonville, for petitioner.

Clayton, Arnow, Duncan & Johnston, Gainesville, for respondents.

BEN C. WILLIS, Circuit Judge.

This cause came on for hearing on the petitioner's petition for a writ of certiorari to review official orders of the respondent, Florida Milk Commission, bearing numbers NE-8; 8-N; TB-6; 10 x (11) ; and CF8, each dated November 20, 1958, filed with the Secretary of State, December 13, 1958, with effective date set forth as January 1, 1958. To this petition the respondents have filed their motion to deny and dismiss the petition. Briefs of the parties have been filed and studied and oral argument by counsel for the respective parties heard and the court is advised of its opinion in the premises.

This case originated by a petition for writ of certiorari in the Supreme Court of Florida in case no. 29,020. The Supreme Court, by opinion dated February 10, 1958, 100 So. 2d 395, determined that "jurisdiction to review such orders [of the respondent commission] is presently lodged in this court and in the circuit courts." It was further held—"As a matter of judicial administration, this court will not ordinarily issue the writ of certiorari to review the ruling of an administrative board so long as a court of inferior jurisdiction is empowered to issue it." It was thereupon ordered—"Accordingly, under rule 2.1 a (5) (d), Florida Appellate Rules,

the petition for certiorari and other papers filed in this court will, at the expiration of five days from the filing of this opinion, be transferred to the clerk of the circuit court of the second judicial circuit, Leon County, Florida. The petition will thenceforth be treated as if it had originally been filed in that court." The cause is therefore before this court pursuant to transfer of same from the Supreme Court.

At the outset, the jurisdiction of this court to issue the writ sought is challenged by ground 4 of respondent's motion which asserts that petitioner may not obtain review that is appellate, or in its nature appellate, by certiorari of the orders here sought to be attacked. It is contended that the orders, which fix the prices to be paid to producers by distributors and producer-distributors for milk in each of the established milk marketing areas of the state, are legislative or quasi-legislative in character and therefore not reviewable by certiorari, citing Swearingen v. Railroad Commission, 79 Fla. 526, 84 So. 444. Certiorari, it is said, is limited only to review of judicial or quasi-judicial orders of administrative boards, bodies, or officers, citing De Groot v. Sheffield, 95 So. 2d 912.

Assuming, but not deciding, that the orders involved are essentially legislative or quasi-legislative in character in that they operate prospectively and do not determine or define existing rights, liabilities, duties, or status of parties at the time the order is issued or had existed prior thereto, is the judicial branch precluded from examining and determining whether such orders have been lawfully issued and are reasonable?

It seems well settled that the scope of certiorari is limited to review of some aspect of judicial or quasi-judicial action of an inferior tribunal or an administrative agency. However, such action may be found not only in the nature and effect of the order itself but also in the legally required procedure to be followed by the agency as a predicate for the order. This seems to be most aptly pointed out in West Flagler Amusement Co., Inc. v. Racing Commission, 122 Fla. 222, 165 So. 64, where the court held that an order of the racing commission apportioning dog racing dates had no judicial attribute or character and was not reviewable by certiorari, but the court further observed—"It will thus be seen that where an order of an administrative . . . commission is purely administrative, or quasi-legislative, or quasi-executive, in character and quality, that such an order is not capable of being reached or affected by the writ of certiorari unless, as an incident to the arriving at or making of such order by the promulgative authority, a notice and hearing, judicial in nature, is required by law to be

observed as a condition precedent to the commission, board or bureau's exercise of the quasi-legislative or quasi-executive power comprehended in the terms of the order it attempts to enunciate."

It thus becomes necessary to examine the statutes upon which these orders derive their authority. Chapter 501, Florida Statutes, creates the milk commission and defines its powers and duties. Section 501.13, F.S., deals with the commission's power to fix prices to be paid for milk. In subsection (1) the commission is empowered to "ascertain by such *investigations* and proofs as the emergency permits or requires what prices for milk in the several localities and markets of the state and under varying conditions, will best protect the milk industry in the state and insure a sufficient quantity of pure and wholesome milk to adults and minors in the state, having special regard to the health and welfare of children, and be most to the public interest." (Emphasis supplied.) It then sets forth certain matters to be taken into consideration in ascertaining such prices. Subsection (4) provides for the fixing of such prices (to be paid producers by milk dealers) by the commission "after making such *investigation.*" (Emphasis supplied.)

Section 501.06 provides, in part—"The practice and procedure of the commission *with respect to any investigation* by the commission *authorized by this chapter* shall be in accordance with rules and regulations to be promulgated by the commission which shall provide for a reasonable notice to all persons affected by orders to be made by the commission after such investigation, opportunity to be heard in person, or by counsel, and to introduce testimony in their behalf *at a public hearing* to be held for that purpose." (Emphasis supplied.)

Also set forth in this section are provisions for administration of oaths, taking depositions, issuing subpoenas and compeling attendance of witnesses and other production of evidence.

Also in F.S. 501.04 (9) it is provided that the commission has power to fix prices to be paid producers by distributors, milk dealers or producer-distributors in any market or markets, but it is also provided that such fixing of prices shall be "after *public hearing and investigation.*"

These statutory provisions thus require a hearing and procedures which have judicial attributes and a judicial nature as a predicate for orders fixing prices. Therefore it is concluded that the orders involved in the cause are not outside of the scope of certiorari.

Consistent with this conclusion is the effect of the Supreme Court ruling in transferring this case to this court in which it is said that under present constitutional provisions "jurisdiction to review such

orders is presently lodged only in this court and in the circuit courts." It would seem logical that the Supreme Court would have merely dismissed the petition if the orders were beyond judicial examination.

One further point is worthy of comment on this question. Section 501.09 (5), Florida Statutes, provides that any applicant, permittee or licensee aggrieved by *any action* of the commission may within a specified time "file a petition in error in the circuit court, which shall have jurisdiction to reverse, vacate, or modify the order complained of, if upon consideration of the record such court is of the opinion that such order was unlawful or unreasonable." It then details the procedures to be followed in processing such review by the circuit court. See also F.S. 501.13 (7) with regard to review.

The Supreme Court in the opinion relating to the transfer of this case to this court, held, following the earlier case of Codomo v. Shaw, 99 So. 2d 850, that—"The appellate *procedure* provided for in F.S. 501.09 (5) has been superseded by the Florida Appellate Rules and the challenged orders are reviewable only by petition for certiorari as provided by the Rules." (Emphasis supplied.)

Thus it would seem that it is the statutory *procedure* for judicial review, and not the right of review the statute provides, that is now modified by the constitutional amendment (which became effective since the enactment of the statute) and by the rules promulgated pursuant to the constitutional amendment. The right to review, either conferred by statute or otherwise existing, is now exercised by certiorari proceedings in accordance with rules promulgated relating to such review.

The next point raised by respondents is that the petition does not show or allege an interest in the petitioner sufficient to entitle it to review by certiorari the five orders challenged. It is true that the petition should sufficiently show the cause of complaint by the party aggrieved and that such party has such an interest as would entitle him to prosecute the writ. Great American Insurance Co. v. Peters, 105 Fla. 380, 141 So. 322.

Though the petition itself does not even state what the petitioner's business is or that each of the orders complained of shall injure it in a particular way, such is not a fatal defect. F.A.R. 4.5 (c) prescribes the procedure in certiorari and in subsection (1) it requires that the petition, unless otherwise ordered by the court, be accompanied by a certified transcript of the proceedings sought to be reviewed. It further states—"The petition shall contain a concise statement of the cause and the reasons relied on for granting the writ."

The record shows that notices of the public hearing held October 15, 1957 were sent out to all licensed producers and distributors (p. 2). A stipulation in the record sets forth that petitioner received such a notice. The petitioner is such a large and well known milk concern that it is a matter of general knowledge that petitioner is a milk distributor operating in this state, and presumably licensed as such. The court will judicially notice such a matter of general knowledge and also that the petitioner would be affected by price fixing of milk sold by producers to distributors. It is deemed that the petition conforms to the rule and that failure to greater detail its complaint and interest is not fatal. Though the petition does not state specifically that each order affects the petitioner, it is fairly shown that one or some of them may, and as the same assaults are made on each order there is no prejudice to respondents in the failure of the petition to specify wherein each order strikes the petitioner.

It also appears that in form and content the petition is sufficient and upon same and the record the court may proceed to review the several orders involved and adjudicate whether the respondent commission had the power to issue them and if so, whether it proceeded in accordance with the essential requirements of law in their promulgation.

The first inquiry is whether or not the commission had statutory power to issue an order fixing prices to be paid to the producer for his milk, and to classify the milk according to uses as the orders challenged provide.

It is made to appear that prior to the orders here involved, the orders of the commission provided as a price for class I milk in all the marketing areas under its jurisdiction, as the minimum price to be paid to producers, the sum of 61¢ per gallon for each gallon of milk testing 4% butterfat, with the price to be increased or reduced as the case might be, in the amount of $.005 for each 1/10 of 1% by which the particular milk tested more or less than 4% butterfat. (See par. 3 of stipulation.)

Thus the challenged orders, so far as class I milk is concerned, are not the first instances of the establishment by the commission of minimum prices to be paid the producer by the distributors and producer-distributors. Indeed, the only change these orders make with regard to class I milk is that the amount of differential allowed on the butterfat for milk testing more or less than 4% is increased from $.005 to $.0065 for each 1/10 of 1% of butterfat.

However, the orders here reviewed do establish a new area of price fixing at the producer level for classes II and III milk. Previously (except for perhaps a short time in a marketing area no

longer under the commission's jurisdiction), there have been no established minimum prices for classes II and III.

In this regard, the petitioner contends that the statutory powers to fix prices under F.S. 501.13 command that if minimum prices are fixed at the producer level there must also be fixed minimum prices at the distributor level. This being so, it is said, the orders are invalid because there are now no minimum prices at the distributor level. In support of this it is pointed out that this section requires the commission to take into consideration "all conditions affecting the milk industry including the amount necessary to yield a reasonable return to the producer and the milk dealer." Further, it is noted that in subsection (2) it is set forth that after making investigation on the subject the commission "shall fix" minimum wholesale and retail prices and "may fix" maximum prices at this level. By contrast, it is pointed out, subsection (4), which deals with prices to be paid by the dealer to producers, merely states that the commission "may fix" the price or prices to be paid. Upon this logic it is reasoned that the word "shall," dealing with distributor prices, and "may," with producer prices, compel the conclusion that only the latter is optional while the former is mandatory if there is to be any price fixing at all.

There may be reasons why the petitioner is foreclosed from raising this point, but it is not deemed necessary to consider such reasons as other portions of chapter 501 reveal a ready answer.

Section 501.13 must be construed with section 501.04. The latter section sets forth the powers of the commission in some detail and precedes the specification of such powers with the word "may". The first general power given is to "supervise and regulate the entire milk industry of the state." Thus the powers conferred are discretionary and permissive powers to be exercised to such extent as may be found to best carry out the legislative purposes declared in the act. The fixing of prices at the distributor level is a permissive power to be exercised if a proper determination is made that such would serve to carry out the objects of this act. Absence of such determination or a contrary determination would require a non-exercise of that power or a withdrawal of its exercise. Also, the imposition of minimum prices at the producer level and not at the distributor level does not necessarily violate the duty to take into consideration a reasonable return to the producer and to the dealer.

It is certainly *possible* for the commission to find, after taking into consideration "all conditions affecting the milk industry", that prevailing economic conditions alone, including the demand for the distributors' products by the public, adequately provide prices the

distributor may receive to yield him a reasonable return. It *may* also be found that at the producer level the prices paid are inadequate to yield that segment of the industry a reasonable return and that the prices to be fixed would enable both to realize a proper profit.

It is therefore concluded that *there is a valid statutory basis for the orders involved,* if such orders were promulgated pursuant to valid procedures and based upon adequate predicates.

Next follows an examination of whether the orders challenged were properly issued and are promulgated in accordance with essential requirements of law.

The portion of the orders dealing with prices to be paid for class II milk (in excess of 5% of class I milk) and which fixes the prices to be paid as "the price established each month for class II milk, pursuant to the Miami, Florida Federal Milk Marketing Order (the price in NE-8, 8-N and 10-X is 1¢ less than the FMMO)" is assailed as an unlawful delegation of power. It is asserted that the Florida Milk Commission has conferred its price fixing powers on a federal agency and that such is unlawful. Cited in support is Hutchins v. Mayo, 143 Fla. 707, 197 So. 495, 133 A.L.R. 394. This case condemned a statute regulating citrus fruits which authorized grading of fruit according to standards fixed by the U. S. Department of Agriculture or as may be changed or modified in the future by such federal authority.

It appears that the southeastern portion of Florida, known as the "Miami area" is not under the jurisdiction of the Florida Milk Commission (for reasons not necessary to discuss) and that same is regulated by certain orders of the U. S. Department of Agriculture. The federal agency promulgated in 1957 its order no. 188 regulating the handling of milk in this marketing area. This order provides uniform minimum prices to be paid producers by classes of milk. In fixing the prices to be paid for class II milk, the order does not set a rigid monetary sum but a mathematical formula to be applied to the prices being paid on the Chicago market for butter and for powdered milk. The variables in the formula are the market prices from time to time in Chicago (the largest milk and milk products market in the nation) on butter and powdered milk.

The formula is designed to take the actual market prices of butter, the principal product derived from cream, and the market price of milk powder, the principal product of skimmed milk, and by computing the quantities of unseparated milk which would produce a given quantity of these products arrive at a price of the whole milk. The formula also provides for transportation costs from Chicago to

Miami and other factors which logically would affect the price of those products in Miami. In brief, it seeks to translate the value of the milk products to be derived from the whole milk into a price to be paid for the whole milk, and such price is deemed to be substantially equivalent to what the buyer of the milk would have to pay in Chicago, and have them delivered in Miami, for the same products he may realize from the milk he buys in Miami. The prices thus computed according to this formula are officially published from time to time. It appears that prices so established are not the result of some federal officer or agency exercising judgment or discretion. but a mere mathematical computation. The variables are the Chicago prices actually paid in that market.

It thus appears that the commission, in following this process of arriving at the prices, has adopted the formula which has already been promulgated and accepts the mere mathematical computations of the federal agencies based on that formula. The delegation is merely clerical or ministerial. It is therefore concluded that there is no unlawful delegation. Tampa v. Kaunitz, 39 Fla. 683, 23 So. 416.

It is also contended that the commission *failed to comply with certain statutory provisions* because it held a hearing at Tallahassee and at the same hearing proceeded to promulgate orders in each of the marketing areas. It is urged that F.S. 501.13 requires determination of proper prices in the several localities and markets of the state and under varying conditions. Since the orders applicable in each area are the same, except for a differential on class II milk in the northern areas not applicable in the southern areas, it is said to be obvious that the commission did not take into consideration varying conditions as the statute contemplates.

There has not been pointed out to the court and the court has not found in chapter 501 any positive requirements that separate hearings be held for each marketing area or that such hearings be held at any particular place. The mere similarity of the orders does not patently show a failure to consider each area. It also does not follow that a hearing at the state capital in and of itself violated either the letter or spirit of the statute directing consideration of local conditions.

The main thrust against the orders is the contention that the orders grew out of a hearing which was improperly invoked, *violative of organic and statutory requirements* in its procedure, and inadequate in its investigation and production of a basis for its action, and that the orders are void for these reasons.

In order for the court to evaluate and adjudicate these contentions it is necessary for the court to determine what rules *the constitution and the statutes have expressly or impliedly set forth to be*

*met by this administrative agency as a condition precedent to enter the orders here involved.*

As previously observed, F.S. 501.13 requires an "investigation" of what prices for milk will best protect the milk industry and insure an adequate supply of pure wholesome milk and that F.S. 501.06 requires such investigations to "be in accordance with rules and regulations to be promulgated by the commission *which shall provide* for a *reasonable notice to all persons affected by orders to be made* by the commission after such investigation, *opportunity to be heard* either *in person or by counsel,* and *to introduce testimony* in their behalf at a *public hearing* to be *held for that purpose."* (Emphasis supplied.) The hearing may be conducted by the commission, any member thereof, administrator or deputy administrator.

The statute thus plainly requires that there shall be reasonable notice to persons to be affected and that the hearing shall be public. Also the persons to be affected are to be afforded an opportunity to present testimony and to be heard in person or by counsel.

Also 501.13 (7) requires that in altering, revising or amending an official order theretofore made with respect to prices for milk, the commission "shall give a hearing thereon to all parties interested upon reasonable notice to such interested parties and to the public of such hearing in such newspaper or newspapers as in the judgment of the commission shall afford sufficient notice and publicity."

Thus, these statutory provisions, independent of but consistent with constitutional requirements of "due process of law," require compliance with the following substantial rules—

(1) A hearing must be held and notice of same given to interested parties.

(2) Such hearing must be public.

(3) Notice of such hearing must be given in such form and mode of receipt by interested parties as to clearly inform such parties of the time and place of same, and the matters to be investigated or considered at such hearing shall be set forth in the notice with such clarity as to inform of the scope of the action to result from the hearing.

(4) Such notice must be "reasonable" which requires that it be given at a time sufficiently in advance of the hearing to afford interested diligent parties an opportunity to make preparations to attend and to present evidence and be heard on matters within the scope of the hearing; and the time and place of hearing shall be such as to make such hearing accessible to interested parties who exercise reasonable diligence to attend and participate in the proceedings.

(5) At the hearing, interested parties shall be afforded an opportunity to present evidence which is material and relevant to matters within the scope of the hearing and to be heard in person or by attorney on such matters. In connection with these principles, the hearing body or officer may, by timely and appropriate announcement, require parties appearing before it who have a common interest and similar contentions to consolidate their presentations in the interest of avoiding repetition and unnecessary duplication. Also a fair and reasonable apportionment of time between contending parties or groups is often appropriate, desirable or necessary, and the parties may, of course, be confined to the presentation of relevant and material evidence on the matters under investigation and consideration and to discussion within such scope.

(6) The hearing must be orderly. In requiring a hearing the statutes necessarily imply that it be conducted in such a manner that the beneficial objects of such a hearing be not frustrated, that the body clothed with the power to issue binding orders be more adequately informed of the needs and problems involved in the matters being considered and have the benefit of information and suggestions which may lead to meeting the needs and solving the problems. The statute specifically gives the commission power to make regulations and rules governing the practice and procedure in its investigations (F. S. 501.06). In the absence of such rules and regulations, it is nevertheless impliedly required that the hearing be orderly. A very broad discretion is accorded the commission in this regard. The nature of the issues involved, the personalities of those hearing and those being heard, the amount of public interest and a host of other factors enter into this picture. The minimum requirements are that the proceedings be in an atmosphere of tolerance, free from misconduct, oppression and intimidation; and that evidence properly offered be received freely and openly and interested parties be heard with courteous attention. Those conducting the hearing are entitled to respect and courtesy from those appearing at or participating in the hearing, for they are representatives of the state invested with a portion of the sovereign power of the state. Also, those interested persons attending or participating in the hearing are exercising a valuable right and are likewise entitled to courtesy. It is, of course, to be anticipated that controversial issues may be vigorously debated, evidence challenged, and contentions urged or disputed with heat and with feeling. Such is characteristic of many of our democratic processes and is not to be censured. However, the bounds of propriety inherent in a public hearing out of which governmental power is to be exercised demand that temperate deliberation be the master of excessive zeal and that logic and reason prevail over passion and prejudice.

(7) The officer or a boardmember of an administrative agency attendant at the hearing must have an open mind on the issues involved to the extent of giving attention to the evidence properly presented and to contentions urged in good faith and of deliberately weighing the same. This, of course, does not mean that these officials may not have convictions or views on these issues in advance of the hearing, but such should not be of such finality that they cannot be affected by evidence which, when weighed dispassionately, would logically modify or alter such convictions or views. The hearing would be an utterly

futile thing if the hearers had conclusively prejudged the issues. This requirement is necessarily implied whenever a public hearing is required as a condition precedent to taking action.

(8) An adequate record of the proceedings must be kept. See McRae v. Robbins, 151 Fla. 109, 9 So. 2d 284.

(9) There must be findings of fact by the administrative body to support the order entered. McRae v. Robbins, supra; Laney v. Holbrook, 150 Fla., 622, 630, 8 So. 2d 465. This feature will be more fully discussed further on.

(10) The record must show substantial, competent evidence to support the findings on which the order is based. De Groot v. Sheffield, 95 So. 2d 912.

(11) The order promulgated must be reasonable, non-discriminatory, and within the scope of the powers granted by the statute creating the administrative agency and prescribing its functions and duties.

The foregoing rules appear to be *either expressly prescribed by statute or to be necessarily implied consistent with the constitutional requirements of due process of law and equal protection of the laws.*

It therefore becomes necessary to determine whether there has been a breach of these rules to the extent of rendering the orders involved in this proceeding invalid. It is clear and free from contention that a public hearing was held and that notice of same was given to interested parties and to the public. The record reveals that the hearing was conducted on October 15, 1957, commencing at 2:00 P.M. and that it continued during the remainder of the afternoon, continued on October 16, and for a short time on October 17. Notice of the hearing was timely mailed to each licensed producer, distributor and producer-distributor and was published in some 19 daily newspapers which fairly covered the area to be affected. The notice also contained a description of the matters to be considered, setting forth that determination would be made as to whether the commission should fix prices to be paid by milk dealers to producers of class II and III milk or both in the various milk marketing areas and if so the amount or amounts thereof; consideration of existing butterfat differentials pertaining to minimum prices to be paid for class I milk; and determination of whether existing orders relating thereto should be changed and determination whether the prices to be paid for class II and III milk or both are to be fixed, and what, if any, butterfat price differentials shall be established. Other matters to be considered are set forth in the notice, but such are not necessary to detail. Thus it appears that the notice was timely given and clearly informed interested parties of the time and place of the hearing and the matters to be considered there. The orders entered were fully within the scope of the notice of matters to be

considered. Furthermore, the notice also contained a specific invitation to all interested parties and the public "to attend and present such relevant evidence and testimony as may be desired." The notice also stated that parties who desire to be heard are requested to file notice of intention to appear in advance of the hearing with the administrator.

Thus it could hardly be said that the notice did not fully and clearly inform interested parties of the scope of the hearing and further that such parties would have the privilege of presenting relevant and competent evidence on the matters to be considered. Thus, it appears that rules numbered 1, 2, 3, and 4, as above set forth, have been met.

With regard to the requirement that interested parties be afforded an opportunity to present evidence which is material and relevant to matters within the scope of the hearing and to be heard in person or by attorney on such matters, the record shows that there were several representatives of milk dealers, including a representative of the petitioner, who were present and who participated in the hearing. It is to be observed that in large measure the hearing involved discussions between members of the commission but throughout the course of the three days, representatives of interested parties were called upon to express themselves and did express themselves on various matters that were being considered. At times there were verbal exchanges which revealed a clash of personalities, but these instances do not appear to have actually constituted a serious or substantial diversion from the objects of the hearing.

Representatives of distributors participated in the discussions, and, in response to questions of the chairman and other members of the commission, presented information and at times volunteered both information and views. I do not find that there was any refusal to receive from these representatives any testimony or other evidence offered by them.

These representatives of distributors to a large extent urged the commission to avoid fixing prices at any sum greater than that which would be the market value of the various milk by-products, which could be purchased in competitive markets. I do not find in the record any evidence offered or firm contention made that the milk dealers would not realize a reasonable return on the basis of the prices proposed to be fixed. Their main argument was that by being required to pay fixed prices for surplus and distress milk, they would probably have to pay more than would be the case of purchasing the same milk products elsewhere. I do not find that at this hearing the petitioner or other milk dealers were denied an

opportunity to present material and relevant evidence or to be heard in person or by attorney. It is to be observed that the hearing was not conducted with all of the niceties and formalities of a judicial trial by a court of record. Some of the witnesses were put under oath, and others were not. Documents and exhibits are referred to, but not specifically offered or received in evidence. There was no formal examination of witnesses and cross examination. It is not required by the statutes nor is it necessarily implied by statutory and constitutional provisions that an administrative agency hearing be conducted in accordance with the procedure and rules of evidence which are traditionally and inherently followed by established courts of law. They are unrestricted by the technical or formal rules of procedure which govern trials before a court. See Williams v. Whitman, 116 Fla. 196, 156 So. 705; also 47 Am. Jur., page 445. The record does not reveal that the proceedings were conducted in an arbitrary manner or that there was a denial of adequate opportunity to present evidence, advance arguments, and procure deliberation on the matters presented. Therefore, I do not find that rule no. 5, as above mentioned, has been violated.

With regard to rule no. 6, namely that the hearing must be orderly, it appears from the record that the commission did proceed to receive and consider the matters before them in a tolerant manner. It is quite true that the chairman expressed himself quite frequently and that much of the record contains his comments. This is by no means a criticism, as it appears that by his remarks he frequently kept the discussion within the scope of the issues being considered. At times he would take sharp issue with those who made certain contentions or arguments, but on the whole, this was not done with discourtesy or reflection upon the person addressed. At times the discussion would deviate to some extent from price fixing and delve into collateral matters, but substantially the entire hearing stuck pretty close to the real issues under consideration. Remarks were not abusive, oppressive, or intimidating. The most that can be said is that it revealed earnest expressions of conflicting viewpoints, but such did not transgress the bounds of decency or propriety. There were some instances of a colloquy between members of the commission and others which revealed some degree of impatience, but this was no more than may be expected to occur in any forum in which there is debate. It is neither expected nor required that in such a hearing the proceedings be with the sublimity of the proceedings of an English court, in which bewigged and robed participants express themselves in perfect formal courtesy, but often with sophisticated sarcasm. On the other hand, such a hearing must be with greater dignity than a rhubarb with a baseball umpire. What is required is that both

hearers and those being heard conduct themselves in a gentlemanly and courteous manner and with appreciation on the part of both for the importance of the matters under consideration and the purposes to be accomplished in having the hearing. I do not find that the conduct at this hearing violated the requirement that it be orderly.

The next consideration is whether or not the record shows that the members of the commission had open minds on the issues involved. It is certainly to be inferred from the statements that were made from time to time that some members of the commission did have convictions and views on some phases of the matters being considered. However, it certainly cannot be assumed that these men who represent various segments of the milk industry and the public would not have convictions and views. Furthermore, it is not required that their minds be a complete vacuum. The very fact that they called a hearing would indicate that there were at least some preconceived notions that price fixing might be desirable. I have read the entire record twice and have searched to discern the attitudes of the members of the commission as revealed by the various statements made during the course of the hearing. I certainly cannot reach the conclusion that the members of the commission who expressed themselves were unwilling to or failed to consider the arguments and evidence which were presented. They had before them the reports which the milk distributors themselves had made with regard to the prices paid for the various classes of milk. They had the benefit of various analyses and interpretations of these reports made by their auditor. They had the benefit of the facts and views given to them by those who appeared and spoke at the hearing. Their own discussions between themselves frequently exhibited a deliberate weighing of the evidence. They examined quite minutely the various methods of computing prices according to several suggested formulas. They debated with each other. They examined the effects of what they proposed to do before reaching a conclusion. It is perhaps significant that after they had adopted certain fixed prices at the October meeting, they convened again in November and reconsidered such prices and adopted other prices substantially lower which have been embodied in the orders here challenged.

A consideration of the entire record fails to show that the members of the commission did not have open minds on the issues involved or that they failed to give attention to and to deliberately weigh the evidence before them. Thus, it is not made to appear that there has been any violation of rule no. 7 above.

No contention is made that there is not an adequate record of the proceedings as required by rule no. 8 above mentioned.

Next to be considered are rules 9 and 10, namely that there must be findings of fact to support the orders and that the record must show substantial competent evidence to support such findings. The petitioner urges that the Supreme Court of Florida in McRae v. Robbins, supra, has ruled that an administrative order which does not contain findings of fact upon which the order is based is void. The orders challenged contained two "whereas clauses" which set forth that "the commission has now ascertained . . . the prices the producers in this area should now be paying for milk in this marketing area that will best protect the milk industry and insure a sufficient quantity of pure and wholesome milk to adults and minors, with special regard to the health and welfare of children, and that will be most to the public interest." And also, "the commission has deemed that the following prices to be paid producers in this area are reasonable and necessary." Following these clauses is the body of the order. It is asserted that these findings are inadequate, *as F.S. 501.31, requires that the commission shall take into consideration all conditions affecting the milk industry, including the amount necessary to yield a reasonable return to the producer and to the milk dealer.* It is further asserted that this statute requires the commission, in determining what is a reasonable return to the producer, "shall take into consideration the necessary cost incurred in that particular locality in maintaining dairy animals in a healthy condition, paying wages and supplying working conditions to employees sufficient for their subsistence at levels generally obtaining and for the safeguarding of their health in defraying the ordinary fixed charges and operating expense incidental to the ownership, control, and management of a herd of average numerical size, including a reasonable amount representing annual rent of land and equipment necessarily utilized therein and in addition to afford such producer a reasonable return in excess of the cost of production." The statute further requires the commission, in determining *a reasonable return to the milk dealer,* to "take into consideration average operating expenses in processing, storage, transportation, and delivery charges, and all necessary reasonable expenses connected therewith." It is contended that the orders to be valid must contain specific findings of each of those matters mentioned in the statute. Cited in support of this contention is State ex rel Mack v. Florida East Coast Railway, 3 Fla. Supp. 23, 25 (a circuit court decision by Judge Lamar Warren) ; also the Supreme Court cases of Hardy v. City of Tarpon Springs, 81 So. 2d, 503; Hickey v. Wells, 91 So. 2d 206; and Laney v. Holbrook, 150 Fla. 622, 8 So. 2d 465.

I do not conclude that the validity of an order requires that there be a specific finding of fact in the order or in the record of each and every element which the statute directs the commission to consider. If this were so, each and every price fixing order of the milk commission would be required to set forth specific findings with regard to all conditions affecting the milk industry. This would require that they make a finding of what conditions affected the milk industry and how such conditions related to prices to be paid. What McRae v. Robbins directs must be done is a finding of the ultimate facts showing that the statutory authority was followed. The ultimate facts necessary to support a price fixing order is a determination that such prices need to be fixed and that the prices so fixed are reasonable. A finding that they are reasonable necessarily involves a finding that they would yield a reasonable return to the producer and the milk dealer.

Of course, it would have been extremely helpful to this court if there had been set forth a complete digest of the evidence and specific findings of each item that could or may have been considered. However, that is not the test to be applied in determining the validity of an order and the adequacy of the findings of facts set forth therein. It is my view that the findings set forth in the order meet the requirements of law on this point.

In order to determine the existence of substantial, competent evidence to support the findings on which the order is based, it is necessary to examine the entire record. "Substantial, competent evidence" was the subject of discussion in De Groot v. Sheffield, supra. Substantial evidence is said to be such evidence as will establish a substantial basis of fact from which the fact at issue can be reasonably inferred and such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. To be competent, it is said that the evidence relied upon should be sufficiently relevant and material that a reasonable mind would accept it as adequate to support the conclusion reached. In connection with this discussion, the court observed that it was aware of the familiar rule that in administrative proceedings, the formalities in the introduction of the testimony common to courts of justice are not strictly employed. See also Jenkins v. Curry, 154 Fla. 617, 18 So. 2d 521.

At the outset it appears that the classes of milk designated as I, II and III are distinguishable only by the use to which the milk is ultimately put by the distributor. Class I is milk which is sold in fluid form such as the familiar whole milk, pasteurized or homogenized, which reaches the ultimate consumer in bottles or cartons. Class II is milk which the distributor processes by separat-

ing the cream from the skim milk and uses the separated products. Class III milk is that from which the cream is separated and the skimmed milk is dumped or otherwise not used. Classes II and III are both generally referred to as "surplus" milk, or milk in excess of a dealer's class I needs. Class III milk is referred to as "distress" milk, in the sense that the distributor is said to have no real demand for this milk, but he purchases it nevertheless and salvages from it the cream which can be put to useful purposes. It is to be noted that the classifications above mentioned have nothing to do with the quality of the milk and in fact physically the milk in each of the three classes is the same. The customary course of dealings between the milk dealer and the producer is that during a fixed period of a year, a producer delivers all of the milk he produces to a dealer and earns during such period a "base" or "base percentage." At the end of the period, the dealer computes the quantity of all milk purchased from all of its producers and assigns to each producer a "base percentage," which is the percentage of all of the milk received by the dealer during the period which the particular producer delivered. During the remainder of the year, the dealer continues to receive all of the milk which his producers deliver and disposes of the milk in either class I, II, III channels. During a pay period, the producer is paid class I prices for the base percentage of his milk of all of the milk which the dealer has marketed in class I channels. The price for class I milk has for some time been fixed at 61¢ per gallon with a butterfat differential. He is paid for the remainder of his milk by the dealer at prices which the dealer deems to be the market value of the butterfat and the serum solids realized from the milk which does not go into class I channels.

As previously stated, class I prices have been fixed by the commission in prior orders but there were no established prices for any other classes until the orders now under review.

The record shows that the commission requires each milk dealer to submit detailed reports in connection with the milk purchased, the prices paid for the different classes, the quantities of milk handled, "out of area purchases" and prices paid for same, and detailed data with regard to the quantities of milk and the uses made of same. The record further substantiates that there is considerable variance between different dealers in the same area as to the prices paid for class II and III milk and that even in some instances there were differences between separate plants in the same area of the same distributor. As the prices for class II and III milk is what the distributor conceives to be the market price of the useful ingredients derived from the milk, there is a marked lack of

uniformity of the prices paid the various producers. Also, there was evidence to indicate that there were instances of distributors paying their own producers surplus milk prices while at the same time they were purchasing out of area milk at higher prices.

There was also evidence in the record to show that a distributor, to fulfill its class I needs, must receive and have on hand 7% more milk than its estimated class I market requirements. This is for the reason that there is a loss of about 2% in waste and spillage and the remaining 5% is necessary to meet demands beyond scheduled distribution, which frequently arise. Thus, there is presented the circumstances wherein the distributor, in normal and efficient operation, does need to receive from producers and to encourage delivery from them, for class I purposes, a 7% cushion over and above his scheduled and estimated class I distribution.

It is generally recognized that although the price to be paid for the milk is to be determined on the use to which the milk is ultimately put by the distributors, there is yet also the factor of percentage of butterfat in the milk delivered. The norm is 4% butterfat, and the price is varied either up or down in relation to the tested butterfat content of the milk. Prior to the orders involved in this hearing, the price fixed for class I milk was 61¢ for milk with 4% butterfat and a premium of $.005 per gallon was paid for each 1/10 of 1 per cent butterfat in excess of 4%. A similar reduction was made for milk testing less than 4% butterfat. There appears to be no contention but that there should be differentials in price based on butterfat content. Further, it appears that the said .005 was not realistic. As a matter of fact, the representative of one of the larger distributors expressly stated that .0065 is a more realistic figure than .005. The record shows that no one challenged this statement or contended to the contrary.

Viewing the record as a whole, the evidence seems to have shown that in the milk industry of Florida and in each of the marketing areas, the producer was confronted with a considerable fluctuation of prices he received from time to time for his surplus milk. Such fluctuations, sometimes to the extent of several cents per gallon, existed in the same area and at the same time as between distributors and even between different plants of the same distributor.

In substance, the representatives of the distributors contended that sound business practices on their part required that they not pay more for surplus milk than they would have to pay for butterfat and serum solids available from other sources. They point out that the useful ingredients which they can extract from the surplus milk could also be obtained in the open market in the form of butter, butterfat, powdered milk, and other similar ingredients. They rea-

son that they should not be required to pay more than they would have to pay in purchasing these items elsewhere. Such a requirement, they urge, would result in loss to them. In the course of the testimony, it was brought out that as a general proposition the class I sales were at about the break even point, and that it is the marketing of the milk products in which there is profit. This appears to have been based on the survey that had been made a year or more previously, and the record does not show that any contention was seriously urged that a fair return had not been realized in the past on the overall operations.

As a predicate to entering a price fixing order, the commission was required to ascertain the price producers should now be paid for milk that will best protect the milk industry and insure a sufficient quantity of pure and wholesome milk for public consumption and that will be most to the public interest. To arrive at such a determination, the commission is required to consider what prices would yield a reasonable return to the producer, considering his problems of production, and also what would be a reasonable price to be paid by the distributor to enable it to yield a reasonable return in its operations. There is a recognition here that both the producer and *the dealer* must be enabled to *make a fair profit* in order that a sufficient quantity of pure and wholesome milk shall be available to the public, especially to children. The statute recognizes and it is an obvious fact that this essential item in the diet of the people of Florida must, in the public interest, be made available in sufficient quantities and at the times and places needed. To accomplish this, there must be an economically healthy milk industry with a profit incentive to assure the supply of milk to the public. The milk industry must necessarily be economically sound in each of its segments. It is a balancing of these interests that the commission is called upon to accomplish the above mentioned objective. Coincident with the objective of an adequate supply of pure and wholesome milk is the legislative purpose of protection and encouragement of the milk industry and each of its segments. In addition to assuring the consumer of the availability of this product, there is the purpose of providing, through regulation of the milk industry, a substantial enhancement to the economic welfare of the state. Successful milk production not only applies the essential ingredient of a healthy diet for the people, but also a substantial bolster in the agricultural phases of the state's economy. The same is true of the distributor. If they are successful, they have rendered a most valuable service to the public, and at the same time have made a substantial contribution to the economic health of the state. The milk commission is and should be concerned not only with the physical health of the people of the state, but also the economic health

of an important and considerable industrial and commercial activity. The commission is empowered by statute to fix prices to be paid at the various levels of movement of milk from the dairy herd to the purchase of milk by the consumer. If it determines that the fixing of prices is necessary to achieve a better balance, recognizing the rights of each segment concerned, it has the power to do so. Its limitations in fixing such prices are that they shall be reasonable and necessary to yield to producers and distributors a reasonable return of a fair profit.

Stability and uniformity of prices is obviously a desirable result. The producer, confronted with uncertain prices to be received for his product which he can dispose of in only one way and which he cannot himself preserve because of the perishable nature of milk, is handicapped. On the other hand, the distributor has its problems also. It has to find a use and market for that which it receives from the producer.

As the producers are not complaining, or at least they did not make any substantial complaint at the hearing, of the prices which were ultimately fixed in the challenged orders, it may reasonably be assumed that such prices afford to them at least a reasonable return.

With regard to the distributors, it appears substantially that the prices fixed have a rather close relationship to the actual market values of the products to be realized from class II and III milk. The commission had before it, as above mentioned, rather detailed reports from the various distributors relating to their operations. There has been no evidence that the distributors' operations have been unprofitable or that the prices now fixed will render their businesses without a fair return and profit.

They may not be as profitable as would be true without these prices, but there is no showing that they will not receive a fair return. The petitioner must show some substantial injury to it to authorize this court to strike down the orders. American Express Co. v. Weatherford, 84 Fla. 264, 93 So. 740.

I therefore conclude that there was substantial competent evidence before the commission that due to the uncertainty and disparagement of the prices which have been paid for surplus milk, there is need to fix prices to be paid producers for their class II and III milk and that such is in the interest of the consuming public and also in the interest of the milk industry, in consideration of "all conditions affecting" that industry. I also find that there is substantial, competent evidence to sustain the *findings* of the commission that the prices fixed are reasonable and necessary and *that*

*same will afford* a *"reasonable return* to the producer and *to the milk dealer."*

The final consideration which the court must make of these orders is whether or not they are reasonable and nondiscriminatory. It is to be observed that at the conclusion of the October meeting the commission had determined to fix the price of class II milk at 43¢ per gallon and class III at 30¢. In the course of the hearing, two general formulas were advanced. One was that in the interest of simplicity and easy calculation, the class II should be 70% of class I and class III, 70% of class II. This was said to be a more or less "rule of thumb" which would approximate the market values of the milk products derived from class II and III milk. By applying the mentioned 70-70 rule, the class II price would be 42.7¢ and class III, 29.89¢. Apparently, at the conclusion of the hearing in October, the commission had, in principle, followed this simple formula with the variation of setting the price in whole cents instead of fractions. However, at the November meeting, the commission reconsidered the action which they had previously taken and followed in substance another formula which had been proposed. Namely, fixing the prices of class II milk based upon the above mentioned Miami milk marketing order, which is more closely based upon actual market prices of the milk products of butter and milk solids. With regard to class II, the commission adhered to the price of 43¢ for 5% of the class I milk. The record adequately reveals the thinking and findings of the commission in this regard. As previously mentioned, it was pointed out that the milk distributor required fluid milk of 7% above its estimated market needs for class I. Because of this, there was a need to encourage local producers to deliver milk which would produce not only the estimated class I needs, but 7% in addition thereto. Two per cent of this 7% was for spillage. Thus, the commission apparently reasoned that as a premium and inducement to the producer to supply the distributor with the additional 7% which the distributor needed to have on hand, that he should be paid some premium to the extent of the portion which did not go into spillage, but that for the remainder he was to receive only what the Miami formula would provide. With regard to class III, the price ultimately fixed was 26¢ per gallon, which is precisely the butterfat value of milk with 4% butterfat, based upon the .0065 differential for butterfat content which appears to have been generally agreed is realistic.

It is not necessary to decide whether or not the prices first adopted were arbitrary or unreasonable. However, it does appear that the prices ultimately promulgated in the orders here challenged have a reasonable and logical basis and are closely geared to the

market prices of butterfat and serum solids. A reasonable differential in the areas closest to the Chicago market was provided in consideration of transportation costs. The 43¢ for the class II milk to the extent of 5% of the class I milk was based upon a logical consideration of the desirability and need of the distributor to receive this milk from the producer rather than to go into other sources of supply in which higher prices would be paid. This court finds itself unable to conclude that the prices fixed are unreasonable or that they are unfairly discriminatory in favor of one segment of the industry to another. Therefore, on this review, it is found that the respondent commission, in promulgating the several orders challenged, acted within the scope of its statutory authority, proceeded in accordance with the essential requirements of law and that the orders so promulgated are valid.

The petition for a writ of certiorari is therefore denied.